IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MUHAMMAD PAHLAWAN,<br><br>MOHAMMAD MAZHAR,<br><br>GHUFRAN ULLAH, AND<br><br>IZHAR MUHAMMAD<br><br>           Defendants | Case No.<br>3:24-MJ-00016<br>3:24-MJ-00017<br>3:24-MJ-00018<br>3:24-MJ-00019<br><br>_____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINTS AND ARREST WARRANTS

I, Patrick Francisco, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of a criminal complaint charging: **Muhammad PAHLAWAN** with (1) intentionally and unlawfully transporting on board a ship any explosive material, knowing that it is intended to be used to cause, or in a threat to cause, death to any person or serious injury or damage for the purpose of intimidating a population, or compelling a government or an international organization to do or to abstain from doing any act in violation of 18 U.S.C. § 2280a(a)(1)(B)(i); and (2) providing materially false information to a Federal law enforcement officer during a boarding of a vessel regarding the vessel's destination, origin, ownership, registration, nationality, cargo, or crew, while on board a vessel without nationality subject to the jurisdiction of the United States, in violation of 18 U.S.C. § 2237(a)(2)(B); and **Mohammad MAZHAR**, **Ghufran ULLAH**, and **Izhar MUHAMMAD** with providing materially false information to a Federal law enforcement officer during a boarding of a vessel

regarding the vessel's destination, origin, ownership, registration, nationality, cargo, or crew, while on board a vessel of the United States or a vessel subject to the jurisdiction of the United States, in violation of 18 U.S.C. § 2237(a)(2)(B).

2.      On or about January 11, 2024, United States Navy forces interdicted a non-United States maritime vessel (referred to herein as a "dhow") in the Arabian Sea and discovered and seized Iranian-made advanced conventional weaponry, removed fourteen non-United States citizens, secured numerous electronic devices belonging to the fourteen non-United States citizens from the dhow, and transported all items and personnel to a United States Navy vessel, the *USS Lewis B. Puller*.  The Navy had the fourteen individual mariners on board the dhow come aboard the *USS Puller* after it determined that their dhow was no longer safe or seaworthy. The Navy commonly rescues individuals from unsafe vessels and provides them safe passage on military vessels.

3.      I am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the Washington Field Office, Counterterrorism Division.  I have been an FBI Special Agent since January 2021.  I hold a degree in International Studies: National Security and Intelligence. I received specific training from the FBI relevant to violations of federal law and various types of investigative methods.  My responsibilities as an FBI Special Agent include investigating threats that are terroristic in nature, investigating crimes committed by violent extremists, and other international terrorism related matters, to include investigations involving the illegal possession of missiles, rockets, and other destructive devices, as that term is defined under federal law.  In my duties as a Special Agent, I have gained training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of

2

searches and seizures, the exploitation of lawfully obtained evidence and data, and various other procedures.

    4.    This affidavit is intended to show only that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not set forth all of my knowledge about this matter.  This is an ongoing investigation, and I have worked on this investigation with numerous other investigators and other federal personnel.

[Continued on Next Page]

## RELEVANT CRIMINAL LAWS

***Violence Against Maritime Navigation and Maritime Transport Involving
Weapons of Mass Destruction (18 U.S.C. § 2280a(a)(1)(B)(i))***

5.      Pursuant to 18 U.S.C. § 2280a(a)(1)(B)(i), except in certain circumstances,[1] it is a crime to unlawfully and intentionally "transport[]"[2] on board a ship— (i) any explosive[3] or radioactive material, knowing that it is intended to be used to cause, or in a threat to cause, death to any person or serious injury or damage for the purpose of intimidating a population, or compelling a government or an international organization to do or to abstain from doing any act …." 18 U.S.C. § 2280a(a)(1)(B)(i).

---

[1] Section 2280a(a) does not apply to "the activities of armed forces during an armed conflict, as those terms are understood under the law of war, which are governed by that law" or "activities undertaken by military forces of a state in the exercise of their official duties."  18 U.S.C. § 2280a(c).

[2] "Transport" "means to initiate, arrange or exercise effective control, including decisionmaking authority, over the movement of a person or item." 18 U.S.C. § 2280(d)(23).

[3] "Explosive material" means "explosives, blasting agents, and detonators," as well as "gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of [18 U.S.C. § 232(5)], and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion."  18 U.S.C. § 2280(d)(6); 18 U.S.C. § 841(c); 18 U.S.C. § 844(j).  The term "explosive or incendiary device" means "(A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone."  18 U.S.C. § 232(5).

6.      The conduct prohibited by § 2280a(a) is within the jurisdiction of the United States if: (1) "in the case of a covered ship,"[4] if: (a) "such activity is committed … against or on board … a vessel subject to the jurisdiction of the United States[5] …. at the time the prohibited activity is committed;" or (b) "during the commission of such activity, a national of the United States is seized, threatened, injured, or killed;" or (2) "in the case of any vessel, if such activity is committed in an attempt to compel the United States to do or abstain from doing any act."  18 U.S.C. § 2280a(b).

---

[4] "Covered Ship" "means a ship that is navigating or is scheduled to navigate into, through or from waters beyond the outer limit of the territorial sea of a single country or a lateral limit of that country's territorial sea with an adjacent country" (i.e., international waters).  18 U.S.C. § 2280(d)(5).  In turn, "ship" "means a vessel of any type whatsoever not permanently attached to the sea-bed, including dynamically supported craft, submersibles, or any other floating craft, but does not include a warship, a ship owned or operated by a government when being used as a naval auxiliary or for customs or police purposes, or a ship which has been withdrawn from navigation or laid up."  *Id.* § 2280(d)(18).

[5] A "vessel subject to the jurisdiction of the United States" includes "a vessel without nationality" and "a vessel assimilated to a vessel without nationality under paragraph (2) of article 6 of the 1958 Convention on the High Seas."  18 U.S.C. § 2280a(b)(1)(A)(i); 46 U.S.C. § 70502(c).  In turn, "a vessel without nationality" includes: "(A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed; (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality; and (D) a vessel aboard which no individual, on request of an officer of the United States authorized to enforce applicable provisions of United States law, claims to be the master or is identified as the individual in charge, and that has no other claim of nationality or registry under paragraph (1) or (2) of subsection (e)."  46 U.S.C. § 70502(d)(1).

*Criminal Sanctions for Providing False Information (18 U.S.C. § 2237(a)(2)(B))*

7.     Pursuant to 18 U.S.C. § 2237(a)(2)(B), it is unlawful for "any person on board a vessel of the United States, or a vessel subject to the jurisdiction of the United States,[6] to—[] provide materially false information to a Federal law enforcement officer[7] during a boarding of a vessel regarding the vessel's destination, origin, ownership, registration, nationality, cargo, or crew."  18 U.S.C. § 2237(a)(2)(B).

## PROBABLE CAUSE

*The Hamas Attack on Israel on October 7, 2023*

8.     Based upon FBI investigation, at approximately 6:30 a.m. local time in Israel on or about October 7, 2023, the day after the fiftieth anniversary of the commencement of the 1973 Yom Kippur War, Hamas[8] breached the border between the Gaza Strip and Israel, infiltrated Israel, and launched a wave of attacks on civilians, by land, sea, and air. As part of its coordinated attacks, Hamas used drones to drop grenades on Israel's observation towers and

---

[6] A "vessel subject to the jurisdiction of the United States" has the same definition as discussed in 18 U.S.C. § 2280a.

[7] "Federal law enforcement officer" "means any officer, agent, or employee of the United States authorized by law or by a Government agency to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of Federal criminal law."  18 U.S.C. § 2237(e)(1); 18 U.S.C. § 115(c).

[8] On October 8, 1997, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act. On October 31, 2001, the Secretary of State also designated HAMAS as a Specially Designated Global Terrorist under Executive Order 13224. The Secretary of State has also listed the following aliases for HAMAS: Islamic Resistance Movement, Harakat al-Muqawama al-Islamiya, Students of Ayyash, Students of the Engineer, Yahya Ayyash Units, Izz Al-Din Al-Qassim Brigades, Izz Al-Din Al- Qassim Forces, Izz Al-Din Al-Qassim Battalions, Izz al-Din Al Qassam Brigades, Izz al-Din Al Qassam Forces, and Izz al-Din Al Qassam Battalions. To date, HAMAS remains a designated FTO. HAMAS, and its military wing, the Izz al- Din al-Qassam Brigades, have claimed responsibility for numerous mass-casualty terrorist attacks perpetrated in Israel, the West Bank, and the Gaza Strip.

remotely operated machineguns in order to incapacitate parts of Israel's infrastructure for monitoring the Gaza/Israel border and responding to breaches of the security fence around Gaza. Israeli sources reported that Hamas also launched at least 3,000 projectiles into Israel from Gaza. At least five people were killed by those initial rocket and artillery attacks. A large cadre of Hamas terrorists simultaneously infiltrated Israel from Gaza using a variety of vehicles and crafts, including trucks, motorcycles, bulldozers, speedboats, and paragliders. The Hamas terrorists entered Israel through at least seven locations and invaded several Israeli communities, the border city of Sderot, and two Israeli military bases. Armed Hamas operatives attacked and shot civilians, including with machineguns, sometimes at point blank range, carrying out massacres in areas in southern Israel, including at a music festival in the Negev desert and at residential communities known in Hebrew as "kibbutzim."[9] During the October 7 Hamas Massacres, Hamas terrorists weaponized sexual violence against Israeli women, including rape and genital mutilation. Hundreds of civilians, including Americans, and Israeli soldiers were killed and wounded; others, including Americans, were kidnapped, taken hostage, and brought into Gaza by Hamas.

9.      According to a Hamas document labeled "Top Secret" recovered from the scene of one of the sites attacked during the October 7 Hamas Massacres, which contained maps showing the locations of the Kfar Aza, Nahal Oz, and other kibbutzim, and described Hamas's plan for "[e]xecuting the mission," the objective of Hamas's terrorist attacks was "causing the highest number of human casualties and taking hostages (and sending some of them to the Gaza

---

[9] A "kibbutz," which refers to the Hebrew word for "gathering," is a type of residential compound common in certain parts of Israel typically organized to promote communal living. Many kibbutzes originated as agricultural or religious communities, but today include a wide diversity of economic projects and industries and are now largely secular communities.

sector[).]"

10.    In connection with the initiation of the October 7 Hamas Massacres, the supreme military commander of the al-Qassam Brigades, Mohammad Al-Masri, a/k/a "Mohammed Deif," a/k/a "al Khalid al-Deif," issued a recorded message in which he "announce[d] the 'Al-Aqsa Flood' operation," and identified himself as "commander-in-chief of the Brigades of the martyr Ezeddine al-Qassam."

11.    Over the course of the October 7 Hamas Massacres, Hamas terrorists attacked dozens of locations in southern Israel, murdering and abducting civilians as they did so.

### *Hamas's Coordination with the Government of Iran*

12.    Based on my review of materials publicly released by both Hamas and the Government of Iran, and their respective leaders, I have learned that Hamas has continued to coordinate closely with the Government of Iran in furtherance of its terrorist activities since the October 7 Hamas Massacres. For example:

   a.  On the day of the October 7 Hamas Massacres, Naser Kan'ani, spokesperson for the Government of Iran's Ministry of Foreign Affairs, spoke to a reporter for an Iranian publication. Kan'ani congratulated the people of Palestine and all the Resistance's anti-Zionist groups and movements in the region, including the Palestinian territories, for the heroic resistance of the Palestinians in Operation Al-Aqsa Storm and said, "what happened today is aligned with the continuous victories of the anti-Zionist Resistance Movement in various areas such as Syria, Lebanon, and the Occupied Territories." Kan'ani also said: "today's operation by the Resistance Movement in Palestine is a turning point in continuous armed resistance by the Palestinians against the Zionists. In other words, it opened a new chapter with this operation in the arena

of resistance by the Palestinians against the Zionists."

b. On or about October 9, 2023, President of Iran Ebrahim Raisi spoke with an identified Hamas member, by phone. As reported by the Office of the President of Iran, Raisi praised the October 7 Hamas Massacres.

c. On or about October 11, 2023, Ahmed Abdulhadi, Hamas's representative in Lebanon, stated on X (previously known as Twitter) that "we coordinated with Hezbollah and with Iran and the Axis before, during and after this battle at the highest level." Abdulhadi explained that this coordination "has many dimensions—political, military and others." The "Axis" was a reference to the so-called "Axis of Resistance," which as set forth above is the term used for Iran's efforts, dating back to the 1979 Islamic Revolution and taken forward by the Islamic Revolutionary Guard Corps and its Qods Force ("IRGC-QF")[10], to engage proxies, such as Hamas and Hizballah, to fight on behalf of Iran in return for funding, arms, military training, and intelligence support.

d. On or about November 16, 2023, the al-Qassam Brigades published a copy of a letter from Ghani, the commander of the IRGC-QF, addressed to "Dear brother, the mujahid leader and living martyr, Abu Khaled Muhammad al-Dhaif," (i.e.,

---

[10] The Government of Iran and its IRGC are among Hamas's principal supporters, and provide significant financing, military training, military supplies and weapons, and diplomatic support to Hamas. The IRGC is an Iranian military and counterintelligence agency under the authority of Iran's Supreme Leader, Ayatollah Ali Khamenei, and is composed of ground, naval, and air forces, as well as other components—including the IRGC-QF. The IRGC-QF is the IRGC's external operations force and is the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups, including Hamas. The IRGC-QF provides materials, logistical assistance, training, and financial support to militias and terrorist operatives throughout the Middle East and South Asia. The IRGC, though the IRGC-QF, has supported the lethal activities of Hamas, Hizballah, and other terrorist groups.  The IRGC has been a designated foreign terrorist organization since on or about April 15, 2019.

Mohammad Al-Masri, a/k/a "Mohammed Deif," a/k/a "al Khalid al-Deif,"). In the letter, Ghani praised what he described as "a great epic titled 'al-Aqsa Flood,' which the Lord of Glory achieved at the hands of the mujahideen in the Izz al-Din al-Qasim Brigades." Ghani applauded the October 7 Hamas Massacres and pledged the IRGC-QF's continuing support for Hamas's terrorist activities, stating:

> It is my honor, in my name and in the name of your brothers in the leadership of the Islamic Republic of Iran, to extend to you and to all the mujahideen and all the other sons of the Palestinian people, my congratulations and blessings on this impressive victory and impactful achievement which has no precedent in the history of the conflict with this entity, asking from Allah the Almighty to grant the martyrs the highest status, and the injured a quick recovery. In conclusion, we affirm the covenant, pledge, and the faith and brotherly commitment that unites us, and we reassure you that, as part of our continued effective protection and support for the resistance, we will do everything we can in this historic battle.

### *Iranian-Backed Houthi Rebel Force Attacks*

13. According to the Department of Defense and open-source information, Houthi rebel forces,[11] previously designated as a foreign terrorist organization by the United States Department of State until February 2021, have engaged in a number of attacks using missiles and associated navigation systems on United States and other vessels beginning in around October 2023 after the October 7 Hamas attack on Israel. Below are specific details of those Houthi rebel forces attacks based on Department of Defense and open-source information.

---

[11] Houthi rebel forces, also known as "Ansarallah," were designated by the United States Department of State as a foreign terrorist organization in January 2021. In February 2021, the Houthis were dedesignated as a foreign terrorist organization. On January 17, 2024, the United States Department of State designated the Houthis as a Specially Designated Global Terrorist group, set to take effect on February 16, 2024.

a. Beginning in and around mid-October 2023, Houthi rebel forces began launching attacks against Israeli interests in an alleged effort to stop Israel's military efforts against Hamas forces in and around Gaza. The *USS Carney*, an American military vessel in the area of operation, appears to have shot down a number of Houthi missiles and drones launched in the direction of Israel.

b. On or around November 8, 2023, Houthi rebel forces shot down an American MQ-9 Reaper drone, claiming that the drone was operating in the area off the coast of Yemen.

c. On November 19, 2023, Houthi rebel forces, using a helicopter, attacked and captured the *Galaxy Leader*, an Israeli-owned cargo ship in the Red Sea, and brought the ship and its crewmembers to a port off the coast of Yemen. The Houthis released video of their attack and capture of the *Galaxy Leader*.[12]

d. On November 29, 2023, the *USS Carney* was operating in the Red Sea and shot down an Iranian-produced KAS-04 unmanned aerial vehicle launched from Houthi-controlled areas of Yemen. The UAV was heading toward the warship. At the time of the shoot down, the *USS Carney* was escorting the USNS SUPPLY (Oiler) and another U.S. flagged and crewed ship carrying military equipment to the region.

e. On December 3, 2023, there were four attacks against three separate commercial vessels operating in international waters in the southern Red Sea. These three vessels were connected to 14 separate nations. The *USS Carney* responded to the distress calls from the ships and provided assistance. According to United States Central Command, "We also have every reason to believe that these attacks, while launched

---

[12] *See* https://www.youtube.com/watch?v=-MJwZ4CRYzs.

by the Houthis in Yemen, are fully enabled by Iran." Specifically, United States Central Command reported as follows:

i.   "At approximately 9:15 a.m. Sanaa time, the *USS Carney* detected an anti-ship ballistic missile attack fired from Houthi controlled areas of Yemen toward the M/V UNITY EXPLORER, impacting in the vicinity of the vessel. UNITY EXPLORER is a Bahamas flagged, U.K. owned and operated, bulk cargo ship crewed by sailors from two nations. The *USS Carney* was conducting a patrol in the Red Sea and detected the attack on the UNITY EXPLORER."

ii.  "At approximately 12 p.m., and while in international waters, the *USS Carney* engaged and shot down a UAV launched from Houthi controlled areas in Yemen. The drone was headed toward the *USS Carney* although its specific target is not clear."

iii. "At approximately 12:35 p.m., UNITY EXPLORER reported they were struck by a missile fired from Houthi controlled areas in Yemen. The *USS Carney* responded to the distress call. While assisting with the damage assessment, the *USS Carney* detected another inbound UAV, destroying the drone with no damage or injuries on the *USS Carney* or UNITY EXPLORER."

iv.  "At approximately 3:30 p.m. the M/V NUMBER 9 was struck by a missile fired from Houthi controlled areas in Yemen while operating international shipping lanes in the Red Sea. The Panamanian flagged, Bermuda and U.K. owned and operated, bulk carrier reported damage and no casualties."

v.   "At approximately 4:30 p.m., the M/V SOPHIE II, sent a distress call stating they were struck by a missile. The *USS Carney* again responded to the distress call

12

and reported no significant damage.  While en route to render support, the *USS Carney* shot down a UAV headed in its direction.  SOPHIE II is a Panamanian flagged bulk carrier, crewed by sailors from eight countries."

    f.    According to open-source reporting, after these December attacks, "Ali al-Qahoum, a member of the Houthi's Ansarullah politburo," stated in an interview with Lebanon-based Al Mayadeen TV: "The Houthis will not abandon the Palestinian cause, regardless of any United States, Israeli or Western threats."

14.    On January 12, 2024, United States Central Command forces, in coordination with the United Kingdom, and support from Australia, Canada, the Netherlands, and Bahrain conducted joint strikes on Houthi targets to degrade their capability to continue their illegal and reckless attacks on U.S. and international vessels and commercial shipping in the Red Sea.  This multinational action targeted radar systems, air defense systems, and storage and launch sites for one way attack unmanned aerial systems, cruise missiles, and ballistic missiles.  At the time of these first United States strikes on Houthi rebel forces, Central Command publicly reported that, "[s]ince Oct. 17, 2023, Iranian-backed Houthi militants have attempted to attack and harass 27 ships in international shipping lanes.  These illegal incidents include attacks that have employed anti-ship ballistic missiles, unmanned aerial vehicles and cruise missiles in the Red Sea and the Gulf of Aden."

15.    On January 13, 2024, United States Central Command publicly reported that "U.S. forces conducted a strike against a Houthi radar site in Yemen.  This strike was conducted by the USS Carney (DDG 64) using Tomahawk Land Attack Missiles and was a follow-on action on a specific military target associated with strikes taken on Jan. 12 designed to degrade the Houthi's ability to attack maritime vessels, including commercial vessels."

16.     Based on open-source reporting, during the week of January 14, 2024, "Houthi military spokesman Brig. Gen. Yahya Saree" claimed another missile attack on a United States-owned ship in a recorded television address and stated, "The Yemeni armed forces consider all American and British ships and warships participating in the aggression against our country as hostile targets."

### *January 11, 2024 Interdiction*

17.     On the night of January 11, 2024, United States Central Command Navy forces, including United States Navy SEALs, as well as members of the United States Coast Guard Maritime Safety and Security Team ("MSST") (together with the Navy personnel, the "Boarding Team"), operating from the *USS Lewis B. Puller* and conducting an authorized flag verification,[13] boarded a dhow off the coast of Somalia.

18.     The members of the Coast Guard's MSST are Federal law enforcement officers as that term is used in 18 U.S.C. § 2237(a)(2)(B).

19.     According to United States Central Command, "U.S. Navy SEALs operating from USS Lewis B. Puller, supported by helicopters and unmanned aerial vehicles ('UAVs'), executed a complex boarding of the dhow near the coast of Somalia in international waters of the Arabian Sea."  The boarded dhow is depicted in the photograph below.

---

[13] Flag verification is when authorized personnel board a ship to verify that the ship has the authority to fly its flag or to determine the nationality of a vessel not flying a flag.



*Dhow as of on or about January 11, 2024*

20.     Once on board, military personnel verified that the dhow did not, in fact, have any flag, in violation of international law.  As a result, the dhow qualifies as a "vessel without nationality," which is subject to the jurisdiction of the United States as that term is used in 18 U.S.C. § 2237.  Similarly, because the dhow was operating in international waters, it qualifies as a "covered ship" and a "vessel without nationality," which is subject to the jurisdiction of the United States as that term is used in 18 U.S.C. § 2280a.

*Suspected Iranian Advanced Conventional Weaponry on the Dhow*

21.     During a search of the dhow, the Boarding Team ultimately located and seized what is believed to be Iranian-made advanced conventional weaponry.  Preliminary analysis of the advanced conventional weaponry indicates that it includes critical components for medium range ballistic missiles ("MRBM") and anti-ship cruise missiles ("ASCM"), to include a warhead, and propulsion and guidance components.

22.     In my training and experience and that of defense personnel with whom I have interacted with during the course of this investigation, I understand that the warhead qualifies as "explosive material" as that term is used in 18 U.S.C. § 2280a(a)(1)(B)(i).

23.     The weaponry and warhead are shown in the photographs below.  By way of reference, in the first picture, the warhead (located in the bottom left of the photo) is shown on top of a wooden pallet, which is approximately 3.5 feet by 4 feet.



*Suspected Iranian advanced conventional weaponry discovered on the dhow*



*The warhead discovered on the dhow*

24.     In my training and experience, and that of defense personnel with whom I have interacted during the course of this investigation, and based on open-source reporting, I understand this type of weaponry to be consistent with weaponry used by the Houthi rebel forces in recent attacks on merchant ships and United States military ships in the region.  Additionally, according to United States Central Command, "Initial analysis indicates these same weapons have been employed by the Houthis to threaten and attack innocent mariners on international merchant ships transiting in the Red Sea.  This is the first seizure of lethal, Iranian-supplied advanced conventional weapons to the Houthis since the beginning of Houthi attacks against merchant ships in November 2023. The interdiction also constitutes the first seizure of advanced Iranian-manufactured ballistic missile and cruise missile components by the U.S. Navy since November 2019. The direct or indirect supply, sale, or transfer of weapons to the Houthis in Yemen violates U.N. Security Resolution 2216 and international law."

25.     Navy forces discovered this suspected Iranian advanced conventional weaponry packaged without markings, labels, or identification in compartments near the front of the dhow. As shown below, much or all of the weaponry was concealed inside tubing or among buoys.





*Suspected Iranian advanced conventional weaponry as discovered by Navy forces*

26.     The military's belief that the weapons are Iranian is based in part on labels on various components, the recovery of similar exploded or destroyed missiles and destructive devices from other Houthi attacks in the region around the time of the seizure, and comparison of seized weapons to known information about Iranian manufactured missiles and rockets.

### Death of Two Navy SEALs Boarding the Dhow

27.     While Navy SEALs were initially boarding the dhow, one SEAL fell into the water in the process of boarding.  Another SEAL, following protocol, jumped into the waters after the first SEAL in a rescue attempt.  The Navy proceeded to conduct an extensive search to locate and rescue each SEAL.  On January 22, 2024, the Navy declared both SEALs deceased.

28.     The remaining SEALs and naval forces who successfully boarded the dhow located the material believed to be Iranian weaponry and encountered fourteen individuals on board.  Navy forces ultimately determined the dhow was unsafe and unseaworthy and sunk the dhow according to protocol.

### MAZHAR's Materially False Statements

29.     MAZHAR was one of the mariners on the dhow when the Boarding Team boarded.  A Pakistani identification card with MAZHAR's name and photograph was found on the dhow.

30.     During the boarding process, members of the Coast Guard's MSST, through an interpreter, interviewed the mariners about the dhow, their roles on the dhow, operation of the dhow, and the cargo.  In response, MAZHAR made the following materially false statements.

31.     First, MAZHAR stated that, while the real "captain" had been on the dhow when the dhow was underway, the "captain" had to leave the dhow to assist another vessel that was

breaking down.  In contrast, and as discussed below, almost all of the other mariners identified PAHLAWAN as the captain of the dhow in subsequent interviews.

32.     Second, MAZHAR explained that another vessel pulled alongside the dhow while the dhow was underway, and this purported "captain" got onto the other vessel.  Multiple other crewmembers stated in subsequent interviews that the dhow did not encounter any other vessel while it was underway.

33.     These false statements were material to the Coast Guard's MSST because they influenced the Coast Guard's understanding of who was in charge of the dhow.

### *ULLAH's Materially False Statements*

34.     ULLAH was one of the mariners on the dhow when the Boarding Team boarded. A Pakistani identification card with ULLAH's name and photograph was found on the dhow.

35.      During the boarding process, members of the Coast Guard's MSST, asked ULLAH, through an interpreter, about, among other things, the crewmembers on the dhow and the cargo on the dhow.  In response, ULLAH made the following materially false statements.

36.     First, ULLAH identified PAHLAWAN as a crewmember and said there was no captain on the dhow.  As explained below, almost all the mariners identified PAHLAWAN as the captain of the dhow in subsequent interviews with the FBI.  Evan ULLAH admitted that PAHLAWAN was the captain when interviewed by the FBI.

37.     Second, ULLAH stated that the dhow had come from Pakistan.  During subsequent interviews, the other mariners said that the dhow came from Iran.  In a subsequent interview with the FBI, ULLAH changed his story and admitted that the dhow came from Iran.

38.     These false statements were material to the Coast Guard's MSST because they influenced the Coast Guard's understanding of who was in charge of the dhow and the origin of the dhow.

### *MUHAMMAD's Materially False Statement*

39.     MUHAMMAD was one of the mariners on the dhow when the Boarding Team boarded.  A Pakistani identification card with MUHAMMAD's name and photograph was found on the dhow.

40.      During the boarding process, members of the Coast Guard's MSST, asked MUHAMMAD, through an interpreter, about, among other things, the crewmembers on the dhow and the cargo on the dhow.  In response, MUHAMMAD made the following materially false statement.

41.     MUHAMMAD stated that he was unaware of any cargo on board the dhow. Based on the size and location of the weaponry found on the dhow and, as explained below, a voice message to MUHAMMAD on the day the dhow left Iran asking whether the "stuff was loaded," there is probable cause to believe that MUHAMMAD knew about the weaponry aboard the dhow.

42.     This false statement was material to the Coast Guard's MSST because it influenced the Coast Guard's understanding of the cargo on the dhow.

### *PAHLAWAN's Materially False Statements*

43.     PAHLAWAN was one of the mariners on the dhow when the Boarding Team boarded.  A Pakistani identification card with PAHLAWAN's name and photograph was found on the dhow.

44.     During the boarding process, members of the Coast Guard's MSST, asked PAHLAWAN, through an interpreter, about, among other things, his role on the dhow and the cargo on the dhow.  In response, PAHLAWAN made the following materially false statements.

45.     First, PAHLAWAN identified himself as the engineer on the dhow.  As discussed below, almost all of the mariners identified PAHLAWAN as the captain of the dhow in subsequent interviews with the FBI.

46.     Second, similar to MAZHAR, PAHLAWAN stated that the real "captain" got off of the dhow before the Navy boarded the dhow.  In addition to most of the other mariners describing PAHLAWAN as the captain, PAHLAWAN's statement is at odds with his subsequent interview, where he explained that the real "captain" never got onboard the dhow.

47.     Third, PAHLAWAN stated that he was not aware of any cargo on the dhow.  As discussed below, there is probable cause to believe that PAHLAWAN was aware of the weapons on the dhow.

48.     These false statements were material to the Coast Guard's MSST because they influenced the Coast Guard's understanding of who was in charge of the dhow and the cargo on the dhow.

### Subsequent Interviews of the Defendants and the Other Mariners

49.     Following the Navy seizure, the fourteen crew members from the dhow were transferred onto the *USS Puller*.  The FBI and NCIS subsequently conducted *Mirandized* interviews of the fourteen crewmembers.[14]  All of the crewmembers denied smuggling weapons. A few crewmembers admitted to being drug smugglers, but there were no drugs found onboard.

---

[14] At or about the same time as the United States requests the criminal complaints and warrants for PAHLAWAN, MAZHAR, ULLAH, and MUHAMMAD, the United States will request material witness warrants for the other ten mariners pursuant to 18 U.S.C. § 3144.

Further, the shape of the some of the destructive devices or components or rockets and missile systems recovered is not consistent with the shape and appearance of concealed narcotics in my training and experience, and that of others on the investigation.

50.     In these interviews, both MAZHAR and PAHLAWAN said that they were brothers.

51.     ***PAHLAWAN's communications and coordination with an affiliate of a foreign terrorist organization.***  Prior to departing on the dhow, PAHLAWAN stated that he had been in Iran for approximately two years.  He said that he began working on the dhow about 10-15 days prior to its departure.

52.     PAHLAWAN said that the dhow left Konarak, Iran approximately six days prior to being boarded by the U.S. Navy.  By point of reference, the U.S. Navy boarded the dhow off the coast of Somalia in the Arabian Sea, meaning that, according to PAHLAWAN, the dhow had travelled from the southern coast of Iran towards Somalia.

53.     PAHLAWAN said that before the dhow left Iran, it was inspected by the Iranian Navy about one hour before departure.  PAHLAWAN said that an individual whom he identified as the "owner" of the dhow, along with another individual he claimed was the "captain" of the dhow were at the inspection.

54.     According to PAHLAWAN, the "captain" gave him a heading for the dhow and told PAHLAWAN that he would meet PAHLAWAN after a few days at sea.  As a result, neither the "captain" nor the "owner" were on the dhow when it was boarded by the U.S. Navy.

55.     PAHLAWAN initially advised the agents that he was given a satellite telephone by the "owner" of the dhow, whom he also described as his employer, located in Iran, who PAHLAWAN knew as an Iranian national whom he identified by first and last name.

PAHLAWAN later stated the satellite telephone was already on board the dhow when PAHLAWAN boarded.   PAHLAWAN stated he would only receive calls on the satellite telephone from the "owner," who would ask PAHLAWAN for periodic updates on the vessel's location.

56.     PAHLAWAN said that he had only received two such calls in the six days that the dhow had been at sea.  FBI agents' physical analysis of the satellite telephone showed that PAHLAWAN received at least four calls from that individual during the days that the dhow was at sea, including one call on the day of the interdiction.  The calls lasted between about a minute to over two-and-a-half minutes.  Further, there were two calls from the satellite phone to the telephone number for the "owner" on the day of the interdiction.  Those calls were not picked up by the "owner."

57.     FBI analysis of the telephone number on the above-referenced incoming calls identified the caller as a known Iranian, with the same first name that PAHLAWAN provided. FBI assesses this individual to be affiliated with a designated foreign terrorist organization involved in smuggling activity.  FBI assesses this individual to be affiliated with the Islamic Revolutionary Guard Corps.   FBI analysis of PAHLAWAN's personal cellular telephone revealed this same telephone number saved in his contact list by the individual's first name only.

58.     Based on my training and experience, I understand that the Iranian government uses non-military vessels, such as the dhow, to smuggle weaponry to other countries, such as to Yemen.  Specifically, I know that it is common for weapons smugglers to travel from Iran to Somalia, and then to conduct a ship-to-ship transfer of the weapons.  The second ship then travels from the coast of Somalia to the Houthis in Yemen.

59.     In my training and experience, PAHLAWAN's purported route for the dhow, traveling from Iran to Somalia, is consistent with other weapons smuggling operations.

60.     ***Identification of PAHLAWAN as the person in charge of the dhow.***  Most of the crewmembers identified the boat's captain as an individual later determined to be the defendant, Muhammad PAHLAWAN.

61.     While the crewmembers were together on the dhow or waiting to be interviewed, PAHLAWAN told the other crewmembers not to identify him as the captain to the FBI, but rather, to say that he was the refrigeration mechanic for the boat.

62.     PAHLAWAN was interviewed twice by the FBI and NCIS.  In both interviews he denied being the captain of the boat, though he did ultimately admit that he was the person who was nominally "in charge" of the dhow because he was the senior sailor on-board since the actual captain had not arrived on the boat.  PAHLAWAN also explained that he had experience working on at least two other dhows from Iran.   He said based on his age and his position as the refrigeration mechanic, he held a respected role within the hierarchy on-board.   Multiple crewmembers said that PAHLAWAN gave them directions on how and where to steer the dhow.

63.     In a preliminary review of PAHLAWAN's cell phone, law enforcement agents found a message dated October 13, 2023, from PAHLAWAN to a woman on Facebook Messenger, wherein PAHLAWAN said, "I am a fish shep [sic] captain."  During the interview, PAHLAWAN also referred to the dhow as "my launch," which, according to the translator, is a reference to a boat.

64.     ***PAHLAWAN's conduct during the Navy's boarding.***  PAHLAWAN admitted that other crewmembers notified him that the Navy was approaching the dhow.  According to PAHLAWAN, he believed that the Navy would board the ship, check it, and then depart.

65.     Two crewmembers indicated that PAHLAWAN told crewmembers not to stop the dhow while the Navy was approaching the dhow.   At least one crewmember said that PAHLAWAN tried to make the dhow go faster when the Navy was approaching.   Multiple crewmembers said it was another crewmember, and not PAHLAWAN, who stopped the boat.

66.     During his interview PAHLAWAN said that he told crewmembers to stop the dhow and denied telling crewmembers to speed up the dhow.

67.     The crewmembers described how PAHLAWAN became very agitated when the U.S. Navy boarded the dhow, and at least one crewmember said that he shouted for the crew to burn the boat before the Navy could board it.

68.     ***PAHLAWAN, MAZHAR, and MUHAMMAD's statements regarding the weaponry on the dhow.***   PAHLAWAN denied in both interviews knowing that the military equipment was located on the dhow.   He and the other crewmembers all claimed that they were merely out on the dhow fishing.   There were no fish found on the vessel, and the crewmembers said that they had not fished.   PAHLAWAN said that he was waiting to get to warmer waters.

69.     PAHLAWAN indicated that he would have thrown illegal cargo overboard if he had known about it.   But he also said that he would have personally inspected any cargo that he knew was on the dhow.

70.     PAHLAWAN also confirmed that, in addition to Facebook, he had Snapchat, Instagram, and TikTok (purportedly for his son).   In my training and experience, information about the war in Israel, the Houthis' attacks on United States' ships in the region, to include both U.S. military and commercial ships (and the Houthis' reasons for conducting such attacks), and Iran's support of the Houthis (and Iran's reasons for doing so), are widely publicized on social media platforms such as Facebook, Snapchat, Instagram, and TikTok.   This is especially true

because of the multiple public announcements from the Houthis, Hamas, and Iran—and the subsequent news coverage of those announcements—some of which are discussed within this affidavit.

71.     Further, during his interview, PAHLAWAN said that he was upset that a Houthi missile could potentially be shot at his Sunni brothers elsewhere in the Middle East.

72.     MAZHAR, for his part, denied seeing the weaponry on the dhow or the packaging that the weaponry was in.  Notably, at least one other mariner stated that MAZHAR was one of the few mariners who went below deck.

73.     Finally, MUHAMMAD initially told members of the Coast Guard MMST during the boarding that he was unaware of any cargo on the dhow.  Further, during his interviews with the FBI, MUHAMMAD stated that he did not see anyone load anything onto the dhow and did not participate in loading anything onto the dhow.

74.     An initial review of MUHAMMAD's cellphone shows that on January 5, 2024— near the time the dhow left Iran—MUHAMMAD received a voice message asking if "the stuff was loaded."  In response, MUHAMMAD said, "Yes, and we're leaving Chah Bahar."

75.     Notably, one of the other mariners explained that the dhow was located in Konarak, Iran the night before the mariners left, but that the dhow was taken to Chah Bahar to get diesel fuel that night.  Chah Bahar is a town on the other side of the Chabahar Bay from Konarak, Iran.  Based on public source reporting from the United States Navy Office of Naval Intelligence, the Islamic Republic of Iran Navy operates a naval base in Chah Bahar.

76.     In an interview with the FBI, MUHAMMAD initially stated that he could not recall why he was talking to the individual who asked him if "the stuff was loaded." MUHAMMAD then said that he was communicating with someone he described as a secretary

27

who records the amount of fish caught on fishing trips.  The "stuff" referred to in the message, according to MUHAMMAD, was purportedly about fish that MUHAMMAD and a friend had caught the day before.

77.     ***Assessment.***  In my training and experience, and based on the evidence described above, I believe that, despite his claims that he was not the captain, PAHLAWAN was functioning as the captain of the dhow because he was in charge of and operating the dhow when it was travelling from Iran towards Somalia and had almost reached its destination at the point of the interdiction. Crewmember statements further support that PAHLAWAN was aware that PAHLAWAN could be in jeopardy with the United States Navy for what they would find on the dhow if they boarded and searched it and that PAHLAWAN wanted to flee the Navy or destroy the dhow, rather than get caught with the cargo.

78.     Further, based on the location of the military equipment in the dhow, the size of the military equipment, and the manner in which it was packaged and interspersed among boating equipment, I believe that PAHLAWAN was aware that he was possessing and transporting the military equipment located onboard, including the warhead.

79.     Finally, due to the publicity of the war in Israel and the Houthis' attacks on vessels in the Red Sea as a means of protesting the United States' support of Israel and as a means of supporting Hamas and Palestine, as well as PAHLAWAN's direction of the dhow towards the area off the Somali coast near Yemen, there is probable cause to believe that PAHLAWAN knew that the weaponry would be used by the Houthis against American and/or Israeli targets or interests in an effort to compel the United States, among other things, to end its support for Israel and/or compel Israel, among other things, to stop the war in Gaza.

### *Continued Houthi Rebel Force Attacks*

80.     According to multiple reports from United States Central Command and other authorities and open-source materials, Houthi rebel forces have continued to use weaponry similar to that seized on the dhow on January 11, 2024.  These attacks have continued to as recently as January 24, 2024.  Below are specific details of those Houthi rebel forces attacks based on Department of Defense and open-source information.

81.     On January 14, 2024, an anti-ship cruise missile was fired from Iranian-backed Houthi-controlled areas of Yemen toward *USS Laboon*, which was operating in the Southern Red Sea.  The missile was shot down in the vicinity of the coast of Hudaydah by U.S. fighter aircraft.

82.     On January 15, 2024, Iranian-backed Houthi rebel forces fired an anti-ship ballistic missile from Houthi-controlled areas of Yemen and struck the *M/V Gibraltar Eagle*, a Marshall Islands-flagged, U.S.-owned and operated container ship.  And, earlier that same day, U.S. Forces detected an anti-ship ballistic missile fired toward the Southern Red Sea commercial shipping lanes.  The missile failed in flight and impacted on land in Yemen.

83.     On January 17, 2024, an assessed one-way attack UAS was launched from Houthi-controlled areas in Yemen and struck M/*V Genco Picardy* in the Gulf of Aden.  M/*V Genco Picardy* is a Marshall Islands flagged, U.S. owned and operated bulk carrier ship.

84.     On January 18, 2024, Iranian-backed Houthi rebel forces launched two anti-ship ballistic missiles at M/*V Chem Ranger*, a Marshall Island-flagged, U.S.-Owned, Greek-operated tanker ship.  The crew observed the missiles impact the water near the ship.

85.     And, as recently as January 24, 2024, Iranian-backed Houthi rebel forces fired three anti-ship ballistic missiles from Houthi-controlled areas of Yemen toward the U.S.-flagged, owned, and operated container ship *M/V Maersk Detroit*, transiting the Gulf of Aden.  One

29

missile impacted in the sea.  The two other missiles were successfully engaged and shot down by the *USS Gravely*.

86.    On January 17, 2024, The United States Department of State designated the Houthis rebel forces as a Specially Designated Global Terrorist group.  According to the Department of State, "[s]ince November, the Houthis have launched unprecedented attacks against international maritime vessels in the Red Sea and Gulf of Aden, as well as military forces positioned in the area to defend the safety and security of commercial shipping.  These attacks against international shipping have endangered mariners, disrupted the free flow of commerce, and interfered with navigational rights and freedoms."[15]

## **CONCLUSION**

87.    Accordingly, there is probable cause to believe that from a date unknown but at least from in or about January 1, 2024, up to January 11, 2024, both dates being approximate, the defendant **MUHAMMAD PAHLAWAN**, and others known and unknown to your affiant, violated the following federal laws: (1) intentionally and unlawfully transporting on board a ship any explosive material, knowing that it is intended to be used to cause, or in a threat to cause, death to any person or serious injury or damage for the purpose of intimidating a population, or compelling a government or an international organization to do or to abstain from doing any act in violation of 18 U.S.C. § 2280a(a)(1)(B)(i); and (2) providing materially false information to a Federal law enforcement officer during a boarding of a vessel regarding the vessel's destination, origin, ownership, registration, nationality, cargo, or crew, while on board a vessel of the United States or a vessel subject to the jurisdiction of the United States, in violation of 18 U.S.C. § 2237(a)(2)(B).

---

[15] *See* https://www.state.gov/terrorist-designation-of-the-houthis/.

88.    Further, there is probable cause to believe that on or about January 11, 2024 **Mohammad MAZHAR**, **Ghufran ULLAH**, and **Izhar MUHAMMAD** provided materially false information to a Federal law enforcement officer during a boarding of a vessel regarding the vessel's destination, origin, ownership, registration, nationality, cargo, or crew, while on board a vessel of the United States or a vessel subject to the jurisdiction of the United States, in violation of 18 U.S.C. § 2237(a)(2)(B).

Respectfully submitted,

Patrick Francisco
Special Agent
Federal Bureau of Investigation

Troy A. Edwards, Jr.
Gavin R. Tisdale
John T. Gibbs
Assistant United States Attorneys
U.S. Attorney's Office, EDVA

Lesley Woods
Trial Attorney
National Security Division, CTS

Sworn to before me in accordance with
Fed. R. Crim. P. 4.1 by telephone on February 11, 2024.

/s/

THE HONORABLE SUMMER L. SPEIGHT
UNITED STATES MAGISTRATE JUDGE